Filed 2/2/21  In re Bishop E. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re BISHOP E. et al., Persons Coming Under the Juvenile Court Law. | B304521 (Los Angeles County Super. Ct. No. 18CCJP05626C, D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JAMES E., <br><br> Defendant and Appellant. | |

APPEALS from findings and orders of the Superior Court of Los Angeles County. Pete R. Navarro, Judge Pro Tempore. Affirmed in part and reversed in part.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Appellant.

_____

Plaintiff and appellant Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition on behalf of Bishop E. (Bishop, born July 2008) and Violet J. (Violet, born May 2013), pursuant to subdivisions (a), (b), (c), and (j).  At the combined jurisdiction/disposition hearing, the juvenile court sustained the subdivision (b) count and dismissed the counts pursuant to subdivisions (a), (c), and (j).  It declared the children dependents of the court and issued a home of parent order, placing them with their father, James E. (father).

In his appeal, father challenges the juvenile court's jurisdictional findings and order assuming jurisdiction over his two children.  He contends that the juvenile court's findings and order are not supported by substantial evidence.  In its cross-appeal, DCFS asks us to reverse the juvenile court's order dismissing the jurisdictional counts pursuant to subdivisions (a), (c), and (j).  It also asks that we reverse the juvenile court's order returning the children to father's home, asserting that the children should have been removed from his physical custody.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

We affirm the juvenile court's finding under subdivision (b) on the grounds that it is supported by substantial evidence. We also conclude that the juvenile court properly dismissed the allegation under subdivision (c) as there is no evidence that Violet suffered extreme emotional harm. However, we agree with DCFS that the juvenile court erred in dismissing the count pursuant to subdivision (a). In light of our conclusion that there are two sustained counts against father, either of which is sufficient to establish jurisdiction, we conclude that DCFS's challenge to the subdivision (j) count is moot. As for the dispositional order, because there is sufficient evidence to support the juvenile court's implicit determination that there were means short of removal to protect the children, we affirm the juvenile court's order returning the children to father.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Detention Report (Nov. 12, 2019)*

<u>The family</u>

This family consists of father, Bishop, Violet,[2] the children's mother, Sonia S. (mother), and the children's maternal grandmother, Sonia M.[3] (grandmother). At the time these proceedings commenced, the children and grandmother all lived in father's home and mother's whereabouts were unknown.[4]

---

[2]    Violet is not father's biological child; she is his stepdaughter. Pursuant to a prior juvenile court order, father has sole custody of her.

[3]    Grandmother is also identified as Tonya M. and Sofia M.

[4]    Mother is not a party to this appeal, and her whereabouts remained unknown throughout these proceedings.

3

Prior DCFS involvement

In November 2018, the juvenile court assumed jurisdiction over the children based on mother's substance abuse problems, which placed the children at substantial risk of suffering serious physical harm. In May 2019, the court terminated jurisdiction and issued a final custody order that granted father full custody of the children on the condition that he continue living with grandmother.

Instant referral

On October 13, 2019, DCFS received a child welfare referral alleging physical and emotional abuse of Violet by father. This abuse consisted of father screaming at her, pulling her by her arms and shirt, throwing away her food, and making her stand for several hours near a wall. Because of the abuse, Violet had visible bruising on her arm and chest area.

*First interview with grandmother*

On October 16, 2019, a DCFS social worker interviewed grandmother over the telephone. She confirmed the referral's allegations and described how father had abused and neglected Violet. On Violet's birthday in May 2019, father brought home a cake, but he then told Violet, "'You can't have any because you were bad.'" Father then threw the cake into the trash, causing Violet to cry. Father had also thrown away Violet's uneaten dinner on a past occasion. Sometime around June 2019, grandmother observed a scratch on Violet's chest that took approximately two weeks to heal. On multiple occasions, she observed father grab Violet by the collar of her shirt and while screaming obscenities at her, such as "'fuck'" and "'bitch.'" The last occasion occurred two weeks earlier, when father also put Violet in the closet. A few days earlier, she observed father

making Violet stand and sit in front of a wall from 9:00 a.m. to 11:00 p.m., only allowing her to take bathroom and food breaks. When grandmother told father that she was going to report him, he told her to "'mind [her own] business'" and threatened to report her to immigration authorities.

*Interview with Violet*

The following day, the social worker interviewed Violet at her elementary school. Violet confirmed the referral's allegations and described how father had abused and neglected her. He disciplined her by making her stand near a wall for hours, while only allowing her to take bathroom and food breaks. He also grabbed her by the arms and shoulders and shook her, screamed at her, called her a "'bitch,'" and threw away her birthday cake as punishment. When asked about an injury to her chest, she did not know what the social worker was referencing. When asked about the impact of father's abuse, she replied that it made her feel sad and angry. Finally, she gave conflicting responses as to whether she feared father, first saying she did and later saying she did not.

*Interview with Bishop*

The social worker next went to Bishop's middle school, where she interviewed him. Bishop confirmed the referral's allegations regarding how father made Violet stand or sit in front of a wall for an extended period of time that was "no more than [seven] hours." He also acknowledged that father grabbed and pulled both children by the shirt, saying father did so to get their attention. He denied that father had ever grabbed Violet by the shoulders and shaken her. He also denied that father had ever thrown away Violet's food and said that Violet had to eat rice and beans when she was being punished. He added that Violet was

frequently disciplined because she was often in trouble.  That said, he felt safe in father's care.

*Interview with father*

The social worker then went to the family home, where she interviewed father.  Father discussed how he had obtained custody of the children.  Prior to 2019, he only had contact with them on the weekends.  However, he obtained full custody of them following their removal from mother's custody due to mother's substance abuse.  Grandmother had helped raise Violet throughout the child's life, and she currently helped father with childcare.  Father was considering whether to give legal guardianship of Violet to grandmother.

Father also discussed how he disciplined the children, providing the following examples:  (1) making both children stand in the corner with their hands against the wall for about two hours, while allowing for bathroom and food breaks; (2) having Violet stand in a closet; (3) grabbing the children by their shirts to get their attention; (4) occasionally yelling at the children; (5) throwing away Violet's birthday cake after telling her not to eat it in May 2019; (6) throwing away Violet's dinner on a past occasion; and (7) prohibiting the children from eating their favorite foods.  Father denied hitting the children or pulling the children by their arms, shoulders, or shirts.  Father said that he rarely disciplined Bishop and more frequently disciplined Violet based on her misconduct, which included her getting in trouble at school and having tantrums.

*Second interview with grandmother*

On October 23, 2019, the social worker met with grandmother at a DCFS office.  She showed the social worker a photograph of Violet, which depicted a "noticeable injury to her

6

left arm near the shoulder blade located toward the front" that was "linear and red in color as if the skin was broken." When the social worker inquired about the injury, grandmother replied that it had occurred two months earlier when father "'pulled [Violet] by the arm and began to jerk [Violet] violently because she got in trouble at school.'" Grandmother said she was present when the incident occurred; she attempted to intervene, and she later contacted the police, who responded to the family home but did not proceed further. Grandmother pleaded for DCFS to help Violet, saying father had engaged in similar conduct on several occasions and that she feared for Violet's well-being.

*Removal of the children from father's custody*

On November 5, 2019, the juvenile court issued a warrant authorizing DCFS to remove the children from father's custody.

*Second interview with father*

On October 6, 2019, the social worker met with father and the children at a DCFS office. Father did not provide any relative information despite the social worker earlier asking him to do so. Father also discussed the investigation with the children despite the social worker admonishing him not to do so.

*Section 300 Petition and Detention Hearing (Nov. 8, 2019 & Nov. 12, 2019)*

On November 8, 2019, DCFS filed a petition on behalf of the children pursuant to section 300. Under subdivisions (a), (b)(1), and (j), the petition alleged that father physically abused Violet when he grabbed and violently shook the child, causing a linear red mark, pulled the child's arm, and made the child stand in a closet and face a wall for multiple hours at a time. Father's conduct placed both Violet and Bishop at substantial risk of suffering serious physical harm (counts a-1, b-1, and j-1). Under

7

subdivision (c), the petition alleged that father emotionally abused Violet by calling her derogatory names and screaming in her face, causing Violet to fear father, and placing her at substantial risk of suffering serious emotional damage (count c-1).

On November 12, 2019, the juvenile court held a detention hearing. The juvenile court ordered the children detained from both parents, granted father monitored visitation, and ordered DCFS to provide father with family reunification services, including a parenting program, individual counseling, and other appropriate programs.

*Jurisdiction/Disposition Report (Dec. 5, 2019)*

On November 22, 2019, a dependency investigator interviewed grandmother. She stated that Violet did not have a biological father or mother involved in her life, and that she had served as the child's "'mother figure.'" She also said that she and the children came to live with father in August 2018. While living there, she had observed father physically and emotionally abuse Violet, providing examples of conduct. Father put Violet in the closet for 10 to 15 minutes with the lights off; he made her stand against the wall for hours at a time as a time-out; he once covered her mouth to the extent that Violet complained that she could not breathe; he yelled in her face and closed the windows when doing so to prevent others from hearing him. Additionally, grandmother reported that father called Violet derogatory names and had instructed the children not to say anything to the social workers.

On November 23, 2019, a social worker met with Violet and read the section 300 petition's allegations. Initially, Violet resisted addressing the allegations, saying she did not want

8

father mad at her and did not like it when he became mad at her. Eventually, Violet confirmed that father grabbed her shirt and shook her when she had tantrums, which she described as when she "'cri[ed] and stuff.'" Violet could not recall how many times she had thrown a tantrum. When asked if father's conduct had caused her to suffer any bruising, Violet quickly responded, "'[N]o, He has never left me a mark, he wouldn't do that. He doesn't grab me. I don't want to talk about it.'" When asked if father ever gave her time-outs, Violet replied, "Time[-]out[s] were sad for me because I don't want to be in time out. I didn't like to put my hands up on the wall. Made my arms hurt. I didn't like it when he put me in the closet. I was scared when he would lock me in the closet and he would turn off the lights.'" Violet also confirmed that father yelled in her face, specifically screaming at her not to cry.

Violet then stated she did not want to say more to the dependency investigator because she did not want to get Bishop in trouble, which would mean that father would yell at her again. When asked if father called her any bad names or words, Violet remained quiet and then replied, "'My dad told me not to say things to the social worker[s.] I think [he] basically told me to lie. But he is not a bad person.'" Upon further inquiry, Violet stated, "'[H]e did tell me to say that he was the best dad and a very good dad.'"

On November 26, 2019, the dependency investigator interviewed father. He initially said that Violet had told him that she wanted to return to his home. He also speculated that DCFS had detained Violet for financial purposes. Father then provided a "declaration" that he had written addressing the section 300 petition's allegations. In the declaration, father

9

denied the allegations of abuse and neglect and said that grandmother was attempting to obtain custody of the children by getting DCFS involved with the family.

Also on November 26, 2019, the dependency investigator interviewed a paternal uncle. The uncle described father as strict and overprotective, although he denied that father yelled at the children. The uncle believed that grandmother was lying about father's conduct in order to obtain custody of the children from father.

Based upon the obtained information, DCFS recommended that the juvenile court assume jurisdiction over the children, order the children removed from parental custody, and grant family reunification services to father.

*Combined Jurisdiction And Disposition Hearing*

On December 5, 2019, January 3, 2020, and February 4, 2020, the juvenile court held a combined jurisdiction and disposition hearing. After admitting DCFS's reports and a few documents submitted by father into evidence, it heard witness testimony.

DCFS called Violet to testify in chambers, though the child soon became emotional and was unable to answer questions.

Father then called Bishop to testify in chambers. Bishop stated that father disciplined Violet by giving her time-outs, where she would have to sit or stand in a corner for approximately two hours with bathroom breaks, or making her do "standards," such as writing down telephone numbers multiple times. Bishop also stated that he was not afraid of father, he had never seen father hit Violet, and he wanted to return to father's care.

DCFS then called grandmother to testify. She stated that she moved into father's home with the children in August 2018, and that the children had not lived with father until that time. While in father's care, Violet had suffered physical and emotional harm, most recently in October 2019. Specifically, father had (1) screamed in Violet's face and called the child "stupid" and a "bitch", (2) covered Violet's mouth, which made it feel like she was "drowning", (3) made Violet stand in a corner or inside a dark closet for multiple hours during the day, and (4) violently grabbed and shook Violet. Grandmother testified that she had observed bruising on Violet's arm and chest that she attributed to father's physical conduct, and Violet had complained about the pain for two weeks. Grandmother also stated that she had twice observed father become physical with Bishop, such as pulling him up, saying "bitch, I'm talking to you," and throwing him on a bed when he believed that the child was ignoring him. Grandmother further attested that father threatened to call immigration authorities on her when she would tell him that she was going to report father's abuse to the police.

Father testified next. He stated that the children had moved in with him in August 2018, along with grandmother. According to father, Violet had exhibited behavioral issues since moving in with him, which included her crying, screaming, hitting, and having tantrums at school and at home. He initially disciplined her (and Bishop) by talking to them or making them write paragraphs. He also took away their favorite foods or did not let them watch television for more serious matters. His "extreme" punishment was making them sit and stand in a corner for 30 minutes, followed by them writing "standards," and then repeating this cycle two to four times. On occasion, he had

11

to restrain Violet, and he admitted once covering her mouth when she was screaming during one of her tantrums. He denied ever calling Violet a "bitch" or locking Violet in a closet, saying there was no lock on the closet. Father added that Violet's behavior had gradually improved since the children had moved in with him. With respect to the alleged threat to call immigration authorities on grandmother, father stated that he had only "reminded" her of her immigration status when she implored him to give her legal guardianship of Violet.

Following testimony, the juvenile court heard argument from the parties with respect to jurisdiction. Father's counsel asked the juvenile court to dismiss the section 300 petition in its entirety. The children's counsel asked the juvenile court to sustain counts b-1 and j-1 and dismiss counts a-1 and c-1. DCFS's counsel asked the juvenile court to sustain the section 300 petition in its entirety.

When ruling, the juvenile court found that it was "more likely than not that Violet is having behavioral issues at school and at home, and that the father exercised inappropriate discipline on her." It then sustained count b-1 as amended by interlineation and dismissed the remaining jurisdictional counts.

As sustained, count b-1 reads as follows: "The children['s] father . . . inappropriately disciplined the child Violet[]. In or about September 2019[, father] grabbed the child by the child's collar and shirt and forcefully shook the child. The child sustained a linear red mark. On prior occasions[,] the father pulled the child Violet's arm aggressively. On a prior occasion[,] the father made the child stand in the closet and face the wall for extended and unreasonable periods. Such inappropriate discipline of the child by [father] endangers the child's physical

12

health and safety, creates a detrimental home environment[,] and places the child and the child's half sibling, [Bishop,] at risk of serious physical harm, damage, danger, and physical abuse."

As dismissed, counts a-1 and j-1 read as follows: "The children['s] father . . . physically abused the child Violet[]. In or about September 2019[,] [he] grabbed the child by the child's collar and shirt and violently shook the child. The child sustained a linear red mark. On prior occasions[,] the father pulled the child Violet's arm aggressively. On a prior occasion[,] the father made the child stand in the closet and face the wall for multiple hours at a time. Such physical abuse of the child by [father] endangers the child's physical health and safety, creates a detrimental home environment[,] and places the child and the child's half-sibling, [Bishop,] at risk of serious physical harm, damage, danger, and physical abuse." Count b-1 had contained the same language prior to its amendment by interlineation.

As dismissed, count c-1 read as follows: Father "emotionally abused the child Violet by calling the child derogatory names and screams in the child's face causing the child to feel sad. The child is afraid of the father. Such emotional abuse of the child by the father places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal, and aggressive behavior toward herself [and] others."

Proceeding to disposition, the juvenile court asked for argument. DCFS's counsel asked for the children to be removed from parental custody, father's counsel asked for the children to be returned to father's home, and the children's counsel only asked that the children be provided services, with no request made as to their placement. The juvenile court declared the

13

children dependents of the court, ordered the children to be returned to father's home, and granted family maintenance services, with DCFS objecting to the home of parent-father order. Father's case plan consisted of a parenting program, individual counseling, and wraparound services. DCFS also sought to have father to drug test based on grandmother's statements that she believed that father used marijuana in the home; the juvenile court denied this request while stating the grandmother "has her own motivations," and it would not "give her testimony any undue weight."

*Notices of Appeal Filed by Father and DCFS*

On February 4, 2020, father timely filed a notice of appeal challenging the juvenile court's exercise of jurisdiction over the children pursuant to section 300, subdivision (b)(1). On February 20, 2020, DCFS timely filed a notice of cross-appeal from the findings and orders made at the combined jurisdiction and disposition hearing.

**DISCUSSION**

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings and dispositional order for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446; *Conservatorship of O.B., supra,* at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the

14

evidence to support the juvenile court's findings and orders." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellants, father and DCFS must establish that the rulings that they respectively challenge are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

That said, "when a heightened standard of proof applied before the trial court, an appropriate adjustment must be made to appellate review for sufficiency of the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Id.* at p. 1005.) In other words, "the clear and convincing standard of proof [has an] effect on appellate review for sufficiency of the evidence." (*Id.* at p. 1010.)

II. *Father's Appeal*

Father argues that the juvenile court erred in assuming jurisdiction over Bishop and Violet because there is insufficient evidence to support the sustained count pursuant to section 300, subdivision (b)(1).

A. <u>Applicable law</u>

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there

is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1396.)

"[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citation.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

B. <u>Analysis</u>

In this case, the juvenile court found that father's "inappropriate discipline" of Violet constituted an inability to adequately supervise the child that placed both Violet and Bishop at substantial risk of suffering serious physical harm. Substantial evidence supports these challenged jurisdictional findings. Father's "inappropriate discipline" of Violet included him engaging in the following pattern of misconduct, some

16

occurring as recent as September 2019: (1) grabbing Violet by the collar of her shirt and forcefully shaking her; (2) aggressively pulling Violet's arm, which caused a lasting lineal red mark and pain; (3) once covering Violet's mouth to the extent she complained she could not breathe; (4) screaming obscenities at Violet when engaging in this violent conduct towards her; and (5) making Violet stand inside a dark closet or with her hands against a wall for multiple hours at a time. Given that father has only cared for the children since August 2018, it was reasonable for the juvenile court to infer that his violent conduct would continue. (See *In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.) Finally, father's misconduct also indicates that he believes physical violence is an appropriate means of disciplining the children. While Violet had only suffered an injury to her left arm, the juvenile court did not have to wait until she or Bishop suffered a more serious injury before exercising jurisdiction over them. (See *In re N.M.* (2011) 197 Cal.App.4th 159, 165 ["The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"].)

Urging us to reverse, father argues that substantial evidence does not support jurisdiction under section 300, subdivision (b)(1), because the juvenile court amended count b-1 to read father "inappropriately disciplined" Violet as opposed to "physically abused" Violet, and that the term "inappropriate discipline" is "frankly pretty meaningless." We are not convinced. Count b-1 is not limited to the one interlineation on which father focuses. Rather, it continues by setting forth the specific inappropriate conduct that father engaged in towards Violet when disciplining her. As set forth above, this pattern of

17

misconduct included him forcibly and aggressively grabbing, shaking, pulling Violet's body, causing pain and injury to her arm, and making her stand inside a dark closet and against the wall for a number of extended and unreasonable periods of time. Accordingly, count b-1 specifies the conduct that the juvenile court determined to be "inappropriate discipline" and indicative that both children were at substantial risk of suffering serious physical harm by father.

Father also argues substantial evidence does not support jurisdiction under section 300, subdivision (b)(1), because his conduct fell within the scope of his parental right to discipline the children. Although "'a parent has a right to reasonably discipline'" their child and to "'administer reasonable punishment'" (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 86), whether a parent acts within or outside the bounds of this right turns on "(1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' [Citations.]" (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)

With respect to the third element, father directs us to only some of his methods of discipline, namely having them face a corner for 30 minutes, writing "standards" afterwards, and then repeating this cycle two to four times, while allowing for bathroom and food breaks. Father adds, "Frankly, as an 'extreme punishment,' it doesn't sound that bad; and it certainly does not constitute a substantial risk of serious physical harm." However, father ignores other evidence in the record showing his unreasonable means of disciplining Violet: He grabbed her by

18

the collar of shirt or her arms and shoulders and forcefully shook her, causing pain and an injury to her arm; he screamed at her and called her obscenities; he made her stand inside a closet; and father ordered Violet to stay in a corner with her hands on the wall for an excessive amount of time, causing her arms to hurt. This evidence supports the juvenile court's exercise of jurisdiction over both children.  (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1525, overruled in part by *Conservatorship of O.B., supra,* 9 Cal.5th at p. 1010, fn. 7 [when reviewing the sufficiency of the evidence, we must consider all the evidence "'in [a] light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order'"].)

Finally, father argues that we should disregard grandmother's statements as supporting the juvenile court's exercise of jurisdiction over the children because she was "biased against [him] due to her desire and efforts to take custody of the children away from him."  (Emphasis omitted.)  To the extent father is asking us to assess witness credibility and/or reweigh the evidence, we cannot, and will not, do so.  (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [""We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court"""].)

Regardless, while the juvenile court stated grandmother had "her own motivations" and indicated that it would not "give her testimony any undue weight" when discussing a dispositional matter, the juvenile court did not find that the grandmother lacked all credibility.  And, many of grandmother's statements were corroborated by Violet, who also said that father had grabbed her by the arms and shoulders and shook her, screamed

19

at her and called her a "bitch," and made her stand against a wall for hours at a time.

In light of this evidence, we conclude that the juvenile court's jurisdictional findings under section 300, subdivision (b)(1), are amply supported.

III.  *DCFS's Cross-appeal*

A.  Jurisdictional counts

DCFS argues that the juvenile court erred in dismissing counts a-1, c-1, and j-1 in the section 300 petition.  "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

1.  *Section 300, subdivision (a)*

Section 300, subdivision (a), authorizes dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . .  For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)  Striking a child with an open hand or fist, causing bruises, constitutes serious physical harm within the

20

meaning of section 300, subdivision (a). (See *In re Veronica G.* (2007) 157 Cal.App.4th 179, 185–186.) Even evidence of a single incident of physical harm to a child is sufficient for the juvenile court to assume jurisdiction under this provision. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.)

We agree with DCFS that the juvenile court's decision to dismiss count a-1 of the section 300 is not supported by substantial evidence. The evidence here compels reinstatement of count (a) because the conduct that the juvenile court found true in order to sustain count (b)(1) necessarily constitutes nonaccidental infliction of harm. (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227.) Specifically, father's pattern of misconduct of forcibly and aggressively grabbing, shaking, pulling Violet's body, causing pain and injury to her arm, covering her mouth to the extent she complained she could not breathe, and making her stand inside a dark closet and against the wall for a number of extended and unreasonable periods of time demonstrated that Violet had suffered serious physical harm inflicted nonaccidentally upon her by father. This evidence, coupled with the evidence that father had been physical with Bishop by throwing him on a bed when he thought the child was ignoring him, compels a finding that both children were at substantial risk of suffering serious physical harm inflicted nonaccidentally by father. And, as discussed in conjunction with father's challenge to the finding under subdivision (b)(1), father's conduct was not reasonable parental discipline; rather, it amounted to physical abuse, compelling jurisdiction over both children pursuant to section 300, subdivision (a).

21

## 2. *Section 300, subdivision (c)*

Section 300, subdivision (c), authorizes dependency jurisdiction over a child if the "child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent." (§ 300, subd. (c).) To prove a child is subject to jurisdiction under section 300, subdivision (c), DCFS bears the burden of showing "(1) serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior or a substantial risk of severe emotional harm if jurisdiction is not assumed; (2) offending parental conduct; and (3) causation. [Citation.]" (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.) When a child is at risk, the juvenile court may take jurisdiction before the child has suffered any actual harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1002–1003.)

Here, the juvenile court rightly dismissed this count in the section 300 petition. There is no evidence that either Violet or Bishop suffered serious emotional damage as a result of father's misconduct. While Violet may have been sad, angry, and/or scared of father, there was no evidence presented of severe anxiety, depression, withdrawal, or untoward aggressive behavior. And, there was no evidence of a risk of such emotional harm.

## 3. *Section 300, subdivision (j)*

"[A]n appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence. [Citations.]" (*In re I.A.* (2011) 201 Cal.App.4th 1484,

22

1492.) "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Applying these legal principles, we refrain from reviewing the juvenile court's order dismissing count (j) of the section 300 petition.

B. <u>Dispositional order</u>

DCFS argues that the juvenile court erred in returning the children to father's home as opposed to removing them from his physical custody.

1. *Applicable law*

"Our society does recognize an 'essential' and 'basic' presumptive right to retain the care, custody, management, and companionship of *one's own child*, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) "The Juvenile Court Law restricts judicial power to remove a child from the care and

23

society of even an abusive or abuse-tolerant parent. [Citations.]" (*In re Kieshia E.*, *supra*, at p. 77.)

The decision to remove a child from parental custody is only authorized when a juvenile court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re H.E.* (2008) 169 Cal.App.4th 710, 718.) The focus of the statute is on averting harm to the child. (*In re Alexzander C.*, *supra*, 18 Cal.App.5th at p. 451.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.]" (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

2. *Analysis*

Applying these legal principles under the appropriate standard of review, we conclude that the juvenile court's home of parent order is supported by substantial evidence. Admittedly, as set forth above, there is evidence that supports the juvenile court's exercise of jurisdiction. But that alone is not sufficient to justify removing the children from their home. (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 811.) Rather, DCFS was required to demonstrate that despite its efforts there were no reasonable

24

means of protecting the children except to remove them.[5]  (*Ibid*.)
It did not do so.

In fact, there is sufficient evidence to support the juvenile court's implicit determination that there were reasonable means to protect the children short of removal.  After all, the juvenile court and DCFS were still involved with this family, and DCFS was specifically authorized to make unannounced home visits to check on the children. (*In re Hailey T*. (2012) 212 Cal.App.4th 139, 148.)  Furthermore, the children were going to be supervised by family members and daycare facilities while father was at work.  Moreover, father was required to participate in a case plan, including individual counseling with wraparound services, where his issues regarding how to discipline and "parent children that present oppositional behaviors" could be addressed.  Under these circumstances, we conclude that the juvenile court did not err in returning the children home with father. (*In re Ashly F*., *supra*, 225 Cal.App.4th at p. 810.)

---

[5]     Curiously, DCFS does not address this requisite statutory element in its appellate brief.

## DISPOSITION

The juvenile court's findings pursuant to section 300, subdivisions (b), (c), and (j) are affirmed.  The juvenile court's order dismissing the count against father pursuant to section 300, subdivision (a), is reversed.  The order assuming jurisdiction over the children is affirmed.  The dispositional order placing the children with father is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT